Filed 5/19/15  East L.A. Health Task Force v. Santa Fe Employees Hosp. CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| EAST LOS ANGELES HEALTH TASK FORCE, INC., | B250881 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. BC470080) |
| v. | |
| SANTA FE EMPLOYEES HOSPITAL ASSOCATION-COAST LINES, | |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Suzanne G. Bruguera, Judge.  Reversed and remanded.

Law Office of Shea Murphy, Shea Murphy; Esner Chang & Boyer and Stuart B. Esner, for Plaintiff and Appellant.

Ballard Spahr, Alan S. Petlak and Ethan Chernin for Defendant and Respondent.

_____

East Los Angeles Health Task Force, Inc. (East LA Health) appeals from the judgment entered after the trial court granted summary judgment in favor of Santa Fe Employees Hospital Association-Coast Lines (Santa Fe) in this action for fraud, negligent misrepresentation and breach of contract. Based on what it considered undisputed facts, the trial court found that each of East LA Health's claims was time-barred and, alternatively, that East LA Health could not prove it had suffered any cognizable injury as a result of Santa Fe's alleged misconduct. We reverse.

## FACTUAL AND PROCEDURAL BACKGROUND

1. *The Parties*

East LA Health, a nonprofit, community-based health care organization, operates an outpatient medical clinic in East Los Angeles serving uninsured and underinsured patients. Santa Fe, a California nonprofit corporation, was organized in 1891 for the purpose of providing medical benefits to railroad workers. It owned real property comprising a full city block in East Los Angeles that included a hospital building, a clinic building and parking lots.

2. *East LA Health's 1991 Agreement with Santa Fe To Purchase the Clinic*

East LA Health began leasing its current clinic property, located at 2120 East Sixth Street, Los Angeles, from Santa Fe in early 1991. At the same time it began negotiating for the purchase of the property. The sale transaction closed in December 1991 pursuant to the terms of a purchase agreement dated February 13, 1991.[1] An entity related to Santa Fe remained the owner of the hospital building and surrounding property.

Paragraph 4 of the purchase agreement provided the total purchase price was $450,000, consisting of a cash payment of $90,000 and a promissory note secured by a purchase money deed of trust "as described in paragraph 7" in the sum of $360,000. Paragraphs 7, 7.1 and 7.2 of the purchase agreement required East LA Health to deliver a

---

[1] The February 13, 1991 purchase agreement was between C. William Meinhold doing business as Investor Management Services and Santa Fe. Two months later Meinhold assigned his right to purchase the clinic building to East LA Health.

purchase money note and purchase money deed of trust to Santa Fe with specified terms and conditions. Pursuant to paragraph 7.1, the purchase money note was to provide for "interest on unpaid principal at the rate of 9 ½ % per annum, with principal and interest to be paid as follows: two hundred forty (240) equal installments of three thousand three hundred fifty-five dollars and sixty-eight cents ($3,355.68) on the first day of each month." Paragraph 7.2(b), labeled "Late Charge," required the note and deed of trust to contain the following provision, "A late charge of 6% shall be payable with respect to any payment of principal, interest, or other charges, not made within ten (10) days after it is due."

In paragraph 12.1(d) of the purchase agreement Santa Fe confirmed, among other warranties and representations, that it "ha[d] no knowledge of any aspect or condition of the Property which violates applicable laws, rules, regulations, codes, or covenants, conditions or restrictions . . . or any unfulfilled order or directive of any applicable governmental agency . . . ." Paragraph 12.1 specified Santa Fe's warranties and representations would survive the closing and delivery of title.

For its part as buyer, in paragraph 12.2 East LA Health (through its assignor) acknowledged that, "except as otherwise stated in this Agreement," "no representations, inducements, promises, agreements, assurances, oral or written, concerning the Property . . . or any other act, ordinance or law have been made by either Party, Broker, or relied upon by either Party hereto." Both parties acknowledged in section 27 that "they have been and are now advised by the brokers to consult and retain their own experts to advise and represent them concerning the . . . condition and/or legality of the Property [including] . . . the condition of title thereto [and] the survey thereof . . . ."

According to Susanna Arellano, the executive director of East LA Health, at some point in 1991, during a walk-through that took place either prior to or contemporaneously with the purchase of the clinic property, Santa Fe employee Cesar Carranceja told Arellano that visitors to the clinic property, which did not have on-site parking, could park in areas adjacent to the hospital and clinic, identified in the litigation as Easement

3

Property 1 (or EP1), Easement Property 2 (EP2) and Easement Property 4 (EP4). Specifically, Arellano was told, as part of the purchase of the clinic property, East LA Health would have exclusive rights to park at EP4, a small paved lot that abutted the eastern entrance to the clinic building, and nonexclusive rights to park at EP1, a parking lot across the street from the clinic, and EP2, a paved lot behind the hospital building on an adjoining site.[2]

---

[2]  In her declaration filed with East LA Health's opposition to the motion for summary judgment, Arellano described the discussion she had regarding parking during the walk-through with "two representatives from Santa Fe, one of which was Cesar Carranceja." According to Arellano, "Santa Fe's representatives and I discussed various details of [East LA Health's] anticipated use of the Clinic Building as a medical clinic, and the suitability of the premises for such purpose. Santa Fe's representatives confirmed with me that the Clinic Building was appropriate for use as a licensed medical facility. [¶] . . . Santa Fe's representatives further told me that, as part of the purchase [of the] Clinic Building, the Clinic Property would have the exclusive right to park at Easement Property No. 4 and the non-exclusive right to park at Easement Properties Nos. 1 and 2, and these Santa Fe representatives physically showed me how to access Easement Properties Nos. 1, 2, and 4, during the walk through."

Although Santa Fe's summary judgment motion did not challenge East LA Health's assertion that these representations regarding parking had, in fact, been made, Santa Fe nonetheless objected to this portion of Arellano's declaration on the grounds of lack of personal knowledge and lack of foundation, explaining, because Arellano could not identify the second representative who participated in the walk-through, "she lacks personal knowledge as to whether that individual was a representative of [Santa Fe]. Ms. Arellano fails to provide any foundation as to her basis for such personal knowledge."

The trial court sustained these objections (as it did every other objection asserted by Santa Fe). We agree with East LA Health that those rulings were in error: Arellano plainly had personal knowledge of statements made to her by individuals acting on behalf of Santa Fe during the event described. Whether those individuals were authorized agents of Santa Fe for some substantive law purpose has no bearing on the admissibility of the statements for purposes of explaining East LA Health's understanding of the transaction. (See *Serri v. Santa Clara University* (2014) 226 Cal.App.4th 830, 852 ["'[i]n determining whether a triable issue was raised or dispelled, we must disregard any evidence to which a sound objection was made in the trial court, but must consider any evidence to which no objection, or an unsound objection was made'"].)

4

3. *Buena Vista's Purchase of the Hospital and Objections to East LA Health's Use of The Property for Parking*

From 1991 through April 2006 East LA Health openly used the three parking lots without any objection. In 2004 Buena Vista Lofts LLC purchased the hospital property along with the adjacent parking areas. In 2006 Buena Vista blocked East LA Health's access to EP1, EP2 and EP4, insisting that East LA Health's employees, patients and visitors did not have the right to park on the hospital property. East LA Health retained counsel to represent it in its dispute with Buena Vista over parking access and intended to initiate a quiet title action. However, because Buena Vista filed for Chapter 11 bankruptcy protection, the lawsuit was delayed. According to Arellano, during this time she called Carranceja and asked him to talk to East LA Health's counsel about its parking rights. Although Carranceja said he would, Arellano does not know whether such a conversation ever took place.

By the time East LA Health obtained relief from the automatic bankruptcy stay, Buena Vista had lost its ownership of the hospital and related properties. Following foreclosure proceedings the property was ultimately acquired by B Squared, Inc., doing business as All California Funding. B Squared made the same parking objections to East LA Health as Buena Vista had previously.

4. *East LA Health's 2008 Lawsuit Against B Squared*

In September 2008 East LA Health filed a quiet title action against B Squared in Los Angeles Superior Court alleging, through its ownership of the clinic property, it was entitled to park on the hospital property through either implied or prescriptive easements over EP Nos. 1, 2 and 4. Following discovery, B Squared moved for summary judgment in October 2009 arguing East LA Health had no parking easements and, alternatively, if there were any such easements, they were unenforceable due to zoning, parking, and subdivision violations. The motion was supported by documents from the City of Los Angeles establishing the various violations. East LA Health asserts this was the first time it learned the parking rights it believed it had were potentially unenforceable as a result of preexisting violations of zoning, subdivision and parking regulation. The motion for

summary judgment was denied, and the B Squared litigation ultimately settled in June 2011 with B Squared granting East LA Health certain parking rights for the clinic property (22 spaces at EP1).

5. *East LA Health's Lawsuit Against Santa Fe*

On September 21, 2011 East LA Health sued Santa Fe alleging causes of action for fraud, negligent misrepresentation and breach of contract.[3] In its unverified complaint East LA Health alleged that Santa Fe represented in the 1991 purchase agreement that it had no knowledge of any aspect or condition of the clinic property that violated applicable laws, rules, regulations, codes, or directives of any applicable governmental agency, but Santa Fe knew that representation was untrue. In fact, the complaint alleged, Santa Fe had been informed by the City of Los Angeles prior to 1991 that violations of subdivision, parking, and zoning law existed regarding the clinic property and as of the execution of the 1991 purchase agreement and the closing of the purchase transaction, Santa Fe knew that those violations existed and had not been corrected.

As explained more fully in East LA Health's papers in opposition to summary judgment, in July 1976 the zoning administrator for the City of Los Angeles conditionally granted Santa Fe's application for continued use of the outpatient medical clinic, subject to, among other conditions, recording a parcel map to legally separate the hospital site and the clinic site and the owner of the hospital site continuing to provide at least nine parking spaces for the clinic site with a recorded covenant memorializing the parking rights. The zoning administrator cautioned, "[I]n the event the property is to be sold, leased, rented or occupied by any person or corporation other than yourself, it is incumbent that you advise them regarding the conditions of this grant." In November 1976 the zoning administrator again notified Santa Fe that no sale would be allowed

---

[3] The complaint also named as a defendant William D. Huff, who had been chairman of the board of Santa Fe in 1991 when the clinic property was sold to East LA Health. Mr. Huff, who apparently died sometime in 2004, was dismissed from the lawsuit in May 2012.

without the proper records. Although a preliminary parcel map was filed, no final parcel map or parking covenant was ever recorded.

In support of its fraud claim East LA Health alleged Santa Fe had falsely represented it knew of no conditions of the clinic property that violated zoning rules or requirements with the intent to induce East LA Health's purchase of the clinic property and further alleged it would not have entered into the purchase agreement or bought the clinic property on the same terms if it had known such representations and statements were not true. With regard to the negligent misrepresentation claim, East LA Health alleged Santa Fe had acted negligently in representing that it was in compliance with all zoning, parking and subdivision laws. The contract cause of action was based on Santa Fe's breach of the warranties and representations contained in the original purchase agreement. East LA Health sought damages including the costs of curing the existing parking, subdivision and zoning violations, as well as the costs incurred in its litigation with B Squared regarding the parking easements.

6. *The Motion for Summary Judgment or, in the Alternative, Summary Adjudication*

After an unsuccessful demurrer, Santa Fe answered the complaint and thereafter moved for summary judgment on two grounds. First, Santa Fe asserted each of the three causes of action was barred by applicable statutes of limitations. Second, Santa Fe argued East LA Health could not establish its purported misrepresentation or breach of warranties was the proximate cause of any legally cognizable injury suffered by East LA Health. In the alternative Santa Fe contended summary adjudication was proper as to the cause of action for breach of contract because East LA Health could not establish its own complete performance under the 1991 purchase agreement. Santa Fe's motion did not contend its representatives had not told East LA Health it would receive parking rights to EP1, EP2 and EP4 at the time of the sale of the clinic property or that East LA Health had not reasonably relied on those representations. Nor did Santa Fe contend East LA Health was actually aware of the zoning and code violations at the time of the purchase transaction.

7

Emphasizing that 20 years had elapsed between the negotiations and completion of the purchase agreement in 1991 and the filing of the instant lawsuit in September 2011, Santa Fe argued the undisputed evidence established East LA Health had inquiry notice that parking, zoning and subdivision violations existed at the property well outside the applicable limitations periods. Specifically, Santa Fe pointed to the purchase agreement itself, which recommended that East LA Health retain experts to advise it on the legal status of the property; East LA Health's discovery in 1995 that parking rights were not expressly conveyed by the deed to the property; multiple incidents over the years when East LA Health patients and employees were denied parking access such as when film crews blocked entry into the parking areas in the late 1990's and early 2000's; and Buena Vista's complete denial of parking access in 2006. With respect to causation and injury, Santa Fe asserted that its purported misrepresentations regarding code violations were unrelated to East LA Health's costs in litigating against B Squared because that lawsuit concerned B Squared's decision to block East LA Health's access to parking, not zoning irregularities. Santa Fe also argued East LA Health had incurred no recoverable litigation fees because it was represented by pro bono counsel in the lawsuit against B Squared. Additionally, Santa Fe pointed to the absence of any evidence that East LA Health had attempted to remedy the violations, that the City required any corrective action or imposed any penalties or fees for the code violations, or (in its reply papers) that the alleged violations still existed.

In the alternative, Santa Fe argued it was entitled to summary adjudication on the breach of contract claim because its alleged breach was excused by East LA Health's nonperformance of its own obligations. In support of this argument Santa Fe alleged East LA Health had failed to make monthly payments for the clinic property in a timely fashion as required by paragraph 7.1 of the 1991 purchase agreement.

7. *East LA Health's Opposition to the Summary Judgment Motion*

In its opposition papers East LA Health argued there were triable issues of material fact as to when it had inquiry notice of the regulatory violations existing at the

8

clinic property and, accordingly, when the applicable statutes of limitations began to run. Although it was undeniably aware of parking-related issues well before it filed its lawsuit in 2011, East LA Health argued that in every situation identified by Santa Fe in its moving papers it could not reasonably suspect the existence of underlying zoning, subdivision or other regulatory violations. East LA Health insisted it only discovered those violations when B Squared raised them in its summary judgment motion filed in October 2009—that is, less than two years before it filed its suit against Santa Fe. East LA Health alternatively argued its three causes of action were timely filed through application of the doctrines of equitable tolling and equitable estoppel.

East LA Health also asserted triable issues of material fact existed as to causation and injury. In part, East LA Health argued Santa Fe was responsible for fees and costs incurred in the B Squared litigation under the tort of another doctrine, whether or not it was represented by pro bono counsel, and contended the violations had made the property less marketable because it could not sell or lease the property without remedying them. Finally, East LA Health explained it had not failed to substantially perform its obligations under the purchase agreement and, at least, issues of fact existed as to that issue, thereby precluding summary adjudication of the contract cause of action.

8. *The Trial Court's Order Granting Summary Judgment Motion*

The court heard argument on the summary judgment motion on April 3, 2013 and took the matter under submission. On May 22, 2013 the court filed its order, adopting with only a handful of minor revisions the proposed order submitted by Santa Fe, granting the motion in its entirety.

The court found East LA Health's three causes of action were barred by the applicable limitations periods, concluding the delayed discovery rule did not apply because East LA Health did not provide, and could not provide, any evidence a reasonable investigation would not have uncovered the information necessary for its lawsuit at an earlier date—information that was contained in documents in public files since at least 1984. The court further found East LA Health's claims against Santa Fe

9

were not subject to equitable tolling during East LA Health's lawsuit against B Squared because proper notice of that action was never given to Santa Fe. Similarly, equitable estoppel did not apply because East LA Health offered no evidence that Santa Fe, aware of the limitations periods, concealed information from East LA Health to induce it to defer filing a lawsuit.

The court also found (in the language presented by Santa Fe) that East LA Health could not establish causation. Any expenses incurred in the B Squared litigation were not proximately caused by the alleged code violations or Santa Fe's failure to disclose them, but by the dispute over parking easement rights. As to the cost to cure the violations, the court explained there was no evidence the City has attempted to require curative action or even that the parking, zoning or subdivision violations still existed.

Finally, the court adopted Santa Fe's argument—finding it "undisputed"—that East LA Health had itself breached the purchase agreement by failing to make the required monthly payments to Santa Fe. Accordingly, the court ruled Santa Fe was also entitled to summary adjudication on the third cause of action for breach of contract.

In its May 22, 2013 order the court also sustained all 34 objections made by Santa Fe to evidence submitted by East LA Health. Judgment was entered on May 28, 2013. On July 12, 2013 the court denied East LA Health's motion for new trial. East LA Health filed a timely notice of appeal.

10

## DISCUSSION

### 1. *Standard of Review*

A motion for summary judgment is properly granted only when "all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." (Code Civ. Proc., § 437c, subd. (c).)[4] We review a grant of summary judgment de novo and decide independently whether the facts not subject to triable dispute warrant judgment for the moving party as a matter of law. (*Schachter v. Citigroup, Inc*. (2009) 47 Cal.4th 610, 618; *Intel Corp. v. Hamidi* (2003) 30 Cal.4th 1342, 1348.) The evidence must be viewed in the light most favorable to the nonmoving party. (*Schachter,* at p. 618.)

When a defendant moves for summary judgment in a situation in which the plaintiff would have the burden of proof at trial by a preponderance of the evidence, the defendant may, but need not, present evidence that conclusively negates an element of the plaintiff's cause of action. Alternatively, the defendant may present evidence to "'show[] that one or more elements of the cause of action . . . cannot be established' by the plaintiff." (§ 437c, subd. (p)(2); *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 853 (*Aguilar*).) "'The moving party bears the burden of showing the court that the plaintiff "has not established, and cannot reasonably expect to establish,"' the elements of his or her cause of action." (*Wilson v. 21st Century Ins. Co*. (2007) 42 Cal.4th 713, 720; accord, *Kahn v. East Side Union High School Dist*. (2003) 31 Cal.4th 990, 1002-1003 ["the defendant must present evidence that would preclude a reasonable trier of fact from finding that it was more likely than not that the material fact was true [citation], or the defendant must establish that an element of the claim cannot be established, by presenting evidence that the plaintiff 'does not possess and cannot reasonably obtain, needed evidence'"].)

---

[4] Statutory references are to this code unless otherwise indicated.

2. *The Trial Court Erred in Granting Summary Judgment on the Ground East LA Health's Claims Were Barred by the Applicable Limitations Periods*

a. *The discovery rule in fraud and contract actions*

The limitations period for East LA Health's fraud and negligent misrepresentation claims is three years. (§ 338, subd. (d); *Broberg v. The Guardian Life Ins. Co. of America* (2009) 171 Cal.App.4th 912, 920 (*Broberg*).)[5] A claim for breach of a written contract ordinarily must be brought within four years of the date of the alleged breach. (§ 337.) Generally, in both tort and contract actions the statute of limitations "begins to run upon the occurrence of the last element essential to the cause of action." (*Neel v. Magana, Olney, Levy, Cathcart & Gelfand* (1971) 6 Cal.3d 176, 187; see *Norgart v. Upjohn Co.* (1999) 21 Cal.4th 383, 397.) "In other words, . . . the time when the cause of action is complete with all of its elements [citations]—the elements being generically referred to by sets of terms such as 'wrongdoing' or 'wrongful conduct,' 'cause' or 'causation,' and 'harm' or 'injury.'" (*Norgart*, at p. 397; accord, *Pooshs v. Philip Morris USA, Inc.* (2011) 51 Cal.4th 788, 797.)

To ameliorate the potentially harsh effects of the general accrual rule, "a number of exceptions have developed by statute and judicial decision, '[t]he most important' one being the delayed discovery rule. [Citations.] A cause of action accrues under the discovery rule when the "'plaintiff either (1) actually discovered his injury and its negligent cause or (2) could have discovered injury and cause through the exercise of reasonable diligence . . . .' [Citations.]' [Citation.] The delayed discovery rule has been applied in 'cases where it is manifestly unjust to deprive plaintiffs of a cause of action before they are aware they have been injured.' [Citation.] The rule protects a plaintiff who is "'blamelessly ignorant'" of his cause of action." (*Brisbane Lodging, L.P. v. Webcor Builders, Inc.* (2013) 216 Cal.App.4th 1249, 1257.)

---

[5] East LA Health's assertion a two-year limitations period governs its negligent misrepresentation cause of action, which is at odds with our decision in *Broberg, supra*, 171 Cal.App.4th at page 920, has no significance for our analysis or holding reversing the order granting summary judgment.

One such explicit manifestation of the delayed discovery rule is included in section 338, subdivision (d), itself, which establishes the basic three-year limitation period for claims based on fraud or mistake, but also provides, "The cause of action in that case is not deemed to have accrued until the discovery, by the aggrieved party, of the facts constituting the fraud or mistake." (See *Broberg, supra,* 171 Cal.App.4th at p. 920; *Royal Thrift & Loan Co. v. County Escrow, Inc.* (2004) 123 Cal.App.4th 24, 28 [three-year limitation period for fraud claims in § 338, subd. (d), incorporates "the delayed discovery rule"].)

Judicial decisions have also extended the delayed discovery rule to certain contract actions, as well. For example, this court in *April Enterprises, Inc. v. KTTV* (1983) 147 Cal.App.3d 805 applied the delayed discovery rule to a cause of action for breach of contract when the plaintiff did not discover the destruction of its property (the erasure of videotapes) until long after its occurrence. As we explained, the injury was "difficult for the plaintiff to detect"; the defendant was in "a far superior position to comprehend the act and the injury"; and the defendant "had reason to believe the plaintiff remained ignorant he had been wronged." (*Id.* at p. 831; see *Gryczman v. 4550 Pico Partners, Ltd.* (2003) 107 Cal.App.4th 1, 5 [delayed discovery rule applicable to breach of contract action because defendant "not only breached the contract 'within the privacy of its own offices' but the act which constituted the breach—failure to give notice of the option offer—was the very act which prevented plaintiff from discovering the breach"]; see also *Cleveland v. Internet Specialties West, Inc.* (2009) 171 Cal.App.4th 24, 33 [breach of contract and fraud claims arising from false representations that new business venture had failed when it was actually operating at a profit under a different name]; cf. *Prudential-LMI Com. Ins. v. Superior Court* (1990) 51 Cal.3d 674, 686-687 [delayed discovery of insured loss].)[6]

---

[6] Santa Fe does not cite *April Enterprises, Inc. v. KTTV, supra*, 147 Cal.App.3d 805 or other decisions that have applied its reasoning and does not argue the breach of

13

As the Supreme Court explained in *Fox v. Ethicon Endo-Surgery, Inc.* (2005) 35 Cal.4th 797 (*Fox*), the delayed discovery rule charges plaintiffs with presumptive knowledge of an injury if they have "'"'information of circumstances to put [them] *on inquiry*'"'" or if they have "'"'*the opportunity to obtain knowledge* from sources open to [their] investigation.'"' [Citation.] In other words, plaintiffs are required to conduct a reasonable investigation after becoming aware of an injury, and are charged with knowledge of the information that would have been revealed by such an investigation." (*Id*. at pp. 807-808, fn. omitted.) "[A] potential plaintiff who suspects that an injury has been wrongfully caused must conduct a reasonable investigation of all potential causes of that injury. If such an investigation would have disclosed a factual basis for a cause of action, the statute of limitations begins to run on that cause of action when the investigation would have brought such information to light." (*Id*. at pp. 808-809.) "[U]nder the delayed discovery rule, a cause of action accrues and the statute of limitations begins to run when the plaintiff has reason to suspect an injury and some wrongful cause, unless the plaintiff pleads and proves that a reasonable investigation at that time would not have revealed a factual basis for that particular cause of action." (*Id*. at p. 803.)

However, the *Fox* Court recognized a plaintiff may be aware of one type of misconduct causing injury while facts supporting a different type of action, through no fault of the plaintiff, may only be discovered at a later date: "Although both claims seek to redress the same physical injury to the plaintiff, they are based on two distinct types of wrongdoing and should be treated separately in that regard." (*Fox, supra*, 35 Cal.4th at p. 814.) Under those circumstances the delayed discovery rule continues to defer the running of the limitation period on the second type of wrongdoing: "[I]f a plaintiff's reasonable and diligent investigation discloses only one kind of wrongdoing when the injury was actually caused by tortious conduct of a wholly different sort, the discovery

warranty alleged by East LA Health is outside the limited category of contract cases that qualify for application of the delayed discovery rule.

14

rule postpones accrual of the statute of limitations on the newly discovered claim." (*Id.* at p. 813.) Thus, in *Fox* the Court held the fact the plaintiff had sufficient information to pursue a medical malpractice action following unsuccessful gastric bypass surgery did not preclude application of the delayed discovery rule to permit a subsequent claim against the manufacturer of a medical device that may have malfunctioned during the surgery, causing her injury. (*Id.* at p. 815.)

Whether the delayed discovery rule applies and preserves an otherwise untimely filed cause of action is generally a question of fact: Did the plaintiff exercise reasonable diligence in discovering the misrepresentation or breach? (See *Gryczman v. 4550 Pico Partners, Ltd., supra*, 107 Cal.App.4th at p. 7; *Cleveland v. Internet Specialties West, Inc., supra*, 171 Cal.App.4th at p. 31.) When, as here, the question of delayed discovery arises in the context of a motion for summary judgment, "the issue is whether the *only* reasonable inference to be drawn from those facts that are undisputed is that [plaintiff] should have learned the facts essential to [its] claims" by a date outside the limitations period. (*Cleveland*, at p. 31; see *Jolly v. Eli Lilly & Co.* (1988) 44 Cal.3d 1103, 1112.)

b. *Triable issues of fact exist as to whether East LA Heath exercised due diligence in discovering the alleged misrepresentations concerning the zoning and subdivision violations*

East LA Health readily acknowledges any claims it might have once had against Santa Fe regarding the failure to convey parking easements as part of the purchase of the clinic property in 1991 are time-barred and have been so for many years. However, analogizing to the difference between the medical malpractice and products liability claims in *Fox, supra,* 35 Cal.4th 797, East LA Health argues, notwithstanding its actual or constructive knowledge of issues regarding parking easements, there are triable issues of material fact whether it had reason to suspect any injury and wrongful cause with respect to zoning, subdivision or other pre-sale regulatory violations affecting the value of the clinic property. We agree that none of the incidents identified by Santa Fe and relied upon by the trial court, whether considered singly or jointly, is sufficient to conclude as a matter of law that East LA Health had sufficient notice of Santa Fe's

15

misrepresentations to justify granting its motion for summary judgment on limitations grounds.

Contrary to the trial court's ruling, that information regarding the regulatory and zoning violations affecting the clinic property was available in publicly filed documents does not, standing alone, preclude East LA Health's use of the delayed discovery rule. Of course, as the trial court stated, if East LA Health had conducted a thorough investigation of compliance issues in 1991 or thereafter, it surely would have become aware of the problems that are the foundation for its current lawsuit. But the question remains whether East LA Health had sufficient reason, in 1991 or at any other time prior to 2009, to undertake such an investigation. (See *Gryczman v. 4550 Pico Partners, Ltd, supra*, 107 Cal.App.4th at p. 6 [rejecting argument delayed discovery rule should not apply as a matter of law because the information necessary to bring plaintiff's claim was in "a recorded document readily available to plaintiff at all times"; "[t]he rule applies when the injury or act causing the injury is 'difficult' for the plaintiff to detect, not impossible"].) As of the time of the purchase agreement itself, East LA Health did not have such knowledge:  Santa Fe expressly assured East LA Health it was aware of no violations or unfulfilled governmental orders or directives, and East LA Health had no reason to disbelieve that representation or probe its truthfulness. (See *Manderville v. PCG&S Group, Inc*. (2007) 146 Cal.App.4th 1486, 1503 ["'[t]he fact that an investigation would have revealed the falsity of the misrepresentation will not alone bar [the plaintiff's] recovery [citations], and it is well established that he is not held to constructive notice of a public record which would reveal the true facts'"], quoting *Seeger v. Odell* (1941) 18 Cal.2d 409, 415.)

Our conclusion is not undermined by language in the purchase agreement recommending that both East LA Health and Santa Fe retain their own experts to advise them concerning the transaction, including the condition of title and other legal matters, in light of Santa Fe's express (and allegedly fraudulent) warranty and representation regarding regulatory matters. (See generally Civ. Code, § 1668 ["[a]ll contracts which

16

have for their object, directly or indirectly, to exempt anyone from responsibility for his own fraud . . . are against policy of the law"].)  Although it may well have been prudent for East LA Health to have done more even without information reasonably triggering a duty of inquiry, and its failure to do so may be relevant to the issue of reasonable reliance, the statute of limitations on East LA Health's misrepresentation and breach of warranty claims did not start to run as a matter of law at the time of the purchase transaction.  (Cf. *Manderville v. PCG&S Group, Inc*., *supra*, 146 Cal.App.4th at p. 1502 ["[i]t is well established in California law that in an action for fraud or deceit, negligence on the part of the plaintiff in failing to discover the falsity of the defendant's statement is no defense when the misrepresentation was intentional"].)

It appears undisputed that by 1994 or 1995 East LA Health had learned that something was amiss with respect to the parking rights it believed it had acquired as part of the 1991 purchase transaction.  Arellano sent Carrenceja a memorandum in 1995 in which she said East LA Health's architect had informed her the deed to the property was silent as to parking even though East LA Health believed it had purchased EP4 as part of the transaction.  Carrenceja apparently responded that parking was not included in the deed.  As East LA Health argues, the absence of a fee interest or express easement for exclusive parking at EP4 does not preclude the existence of an implied or prescriptive easement for parking at the specified locations.  Be that as may, on its face this disagreement about East LA Health's right to parking easements does not necessarily suggest East LA Health had also been the victim of misrepresentations about zoning and subdivision compliance and trigger, as a matter of law, a duty of inquiry regarding that separate injury and wrongful act.  Rather, it properly remains for the finder of fact to determine whether East LA Health should have investigated further at that point.

Similarly, the fact that patients, employees and visitors to East LA Health were prevented from parking at EP2 during filming activities in the late 1990's and early 2000's and thereafter were denied all parking access in 2006 after Buena Vista purchased the hospital property did not necessarily create a duty of inquiry about zoning and

17

subdivision violations.  In other words, that East LA Health should have known that there may be underlying regulatory violations contrary to Santa Fe's representations and warranties is not the only reasonable inference to be drawn from those facts.  Again, that is an issue for the finder of fact.  Accordingly, it was error to grant summary judgment on limitations grounds.[7]

        3. *The Trial Court Erred in Granting Summary Judgment on Causation/Injury*

        Under what is known as the American rule, litigants are ordinarily required to bear the cost of their own attorney fees.  (See, e.g., *Trope v. Katz* (1995) 11 Cal.4th 274, 278-279 [§ 1021 codifies general American rule requiring each party to bear the litigation cost of its own attorney fees].)  In *Prentice v. North American Title Guaranty Corp.* (1963) 59 Cal.2d 618 (*Prentice*) the Supreme Court established a common law exception to this rule in an action involving an escrow holder who had been negligent in closing the sale of property.  As a consequence of that negligence, the sellers were forced to bring a quiet title action against the purchaser and the holder of a first deed of trust.  The sellers secured a judgment of damages against the escrow holder that included the cost of the quiet title action.  Affirming the judgment, the Supreme Court held a "person who through the tort of another has been required to act in the protection of his interests by bringing or defending an action against a third person is entitled to recover compensation for the reasonably necessary loss of time, attorney's fees, and other expenditures thereby suffered or incurred."  (*Id.* at p. 620.)  As the Court of Appeal explained in *David v. Hermann* (2005) 129 Cal.App.4th 672, 688-689, "[d]ecisions applying *Prentice* recognize that it represents an application of the usual measure of tort damages in circumstances where the defendant's tortious conduct has made it necessary for a plaintiff to incur legal expenses to protect his interests."  (Accord, *Mega RV Corp. v. HWH Corp.* (2014) 225 Cal.App.4th 1318, 1337 ["[t]he tort of another doctrine is not really an

---

[7]     Because the existence of triable issues of material fact preclude summary judgment under the delayed discovery doctrine, we need not address East LA Health's alternative arguments based on equitable tolling and equitable estoppel.

18

exception to the American rule, but simply 'an application of the usual measure of tort damages'"].)

To recover attorney fees under the tort of another doctrine, the plaintiff must have brought the action against the third party (here, B Squared) "as 'the natural and probable consequence' of the defendant's [tortious conduct].  [Citation.]  Conversely, when the action against the third party is not a natural and probable consequence of the defendant's [tortious conduct], the attorney fees are not recoverable."  (*Electrical Electronic Control, Inc. v. Los Angeles Unified School Dist.* (2005) 126 Cal.App.4th 601, 616-617.)  If East LA Health were suing Santa Fe for misrepresenting its entitlement to parking easements at EP1, EP2 and EP4, its right to seek fees and costs incurred in its quiet title action against B Squared would fit neatly within the established confines of the tort of another doctrine:  The dispute with B Squared was directly related to East LA Health's belief, which it asserts was based on misstatements by Santa Fe's representatives, that B Squared was unlawfully interfering with its parking rights.  But to avoid a meritorious limitations defense, in this lawsuit East LA Health challenges only misrepresentations (intentional or negligent) regarding zoning, subdivision and parking regulations and rules and the concealment by Santa Fe of any knowledge of those code violations.  Although those issues surfaced during the B Squared litigation, they did not prompt the lawsuit, nor was the lawsuit against B Squared a natural and probable consequence of Santa Fe's alleged tortious conduct.  East LA Health's argument that, but for the misrepresentations regarding known zoning and subdivision violations it would not have purchased the clinic property (that is, causation in fact), is too attenuated to justify recovery under the tort of another doctrine.  (See *Prentice, supra*, 59 Cal.2d at p. 621 [fees must be proximate consequence of defendant's negligence]; see generally *Brewer v. Teano* (1995) 40 Cal.App.4th 1024, 1030 ["Causation in the law of negligence is not determined by a

19

linear projection from a 'but for' premise. Instead, it is expressed in terms of 'foreseeability' and is limited by the policy that cause must be 'proximate.'"].) [8]

Nonetheless, summary judgment was not properly granted on causation/injury. In its complaint East LA Health alleged it was damaged as a proximate result of Santa Fe's misrepresentations "by having to incur additional expenses to attempt to cure [the parking, subdivision and zoning] violations." East LA Health also contended the uncorrected violations affect the marketability (and thus the market value) of the clinic property. Addressing these allegations in its motion for summary judgment, Santa Fe presented as undisputed facts that, as of the time of its motion, the City of Los Angeles had not issued any "order to comply" regarding violations at the clinic property and East LA Health had not attempted to correct the alleged violations. In its reply papers Santa Fe also pointed out that East LA Health's evidence concerning the violations was not current; there was no evidence the violations still existed. The trial court incorporated each of those points in its order granting the motion for lack of causation/injury.

It will be East LA Health's burden at trial to produce admissible evidence establishing that zoning, subdivision or parking regulation violations affecting the clinic property, which Santa Fe failed to disclose in 1991, still exist; that uncorrected those violations affect the market value of the property to some definable extent whether or not the City has demanded compliance; and the cost of curing those violations. On summary judgment, however, it was Santa Fe's burden to conclusively negate these elements of East LA Health's cause of action—that is, to prove that any violations that may have existed in 1991 no longer exist—or to show that East LA Health "has not established, and cannot reasonably expect to establish, a prima facie case of causation [and injury]." (*Saelzler v. Advanced Group 400* (2001) 25 Cal.4th 763, 768; accord, *Ennabe v. Manosa*

---

[8] In light of our conclusion that, even if successful on the merits of its claims for fraud or negligent misrepresentation, East LA Health is not entitled to recover fees relating to the B Squared litigation under the tort of another doctrine, we have no occasion to consider Santa Fe's additional argument that no recovery is warranted because East LA Health was represented in that action by pro bono counsel.

20

(2014) 58 Cal.4th 697, 705; *Wilson v. 21st Century Ins. Co., supra*, 42 Cal.4th at p. 720.) In simply pointing to the deficiencies in East LA Health's evidentiary presentation, Santa Fe failed to do either: It did not negate causation or injury; and, while it amply demonstrated East LA Health needs more to prove its case—for example, current information regarding the clinic property's compliance with zoning and subdivision requirements and a qualified expert to testify to the cost of resolving the various regulatory issues affecting the clinic property—it in no way suggested that such evidence was unavailable. (See *Aguilar, supra*, 25 Cal.4th at p. 855, fn. 23 ["[l]anguage in certain decisions purportedly allowing a defendant moving for summary judgment simply to 'point[]' out '*an absence of evidence* to support' an element of the plaintiff's cause of action [citation] does not reflect summary judgment law as it has ever stood, and is accordingly disapproved"]; see also *Weber v. John Crane, Inc*. (2006) 143 Cal.App.4th 1433, 1439 ["[u]nder the standard enunciated in *Aguilar, supra*, 25 Cal.4th at pages 850-851, the defendant must make an affirmative showing that the plaintiff will be unable to prove its case by any means"].) In sum, in its moving papers Santa Fe failed to shift the burden to East LA Health to present evidence of a triable issue of material fact on the issue of causation/injury; and summary judgment should have been denied. (See *Hypertouch, Inc. v. ValueClick, Inc*. (2011) 192 Cal.App.4th 805, 838-839.)

　　4. *It Was Error To Grant Summary Adjudication on the Breach of Contract Claim*

　　As an alternative to its grant of summary judgment and dismissal of East LA Health's lawsuit in its entirety, the trial court granted Santa Fe's motion for summary adjudication of the cause of action for breach of contract, finding the undisputed facts established that East LA Health had failed to make payments required under paragraph 7.1 of the purchase agreement and its failure to do so had not been excused. Accordingly, it concluded East LA Health could not state a cause of action for breach of contract. The trial court's ruling, adopted verbatim from Santa Fe's proposed order, misstates the governing law, incorrectly interprets the relevant provisions of the purchase agreement and ignores a significant contested issue.

21

The elements of a cause of action for breach of contract, as the trial court explained, are "(1) the existence of the contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) the resulting damages to the plaintiff." (*Oasis West Realty, LLC v. Goldman* (2011) 51 Cal.4th 811, 821.) However, not every failure by the plaintiff to perform will justify the defendant's breach of its own contractual obligations: Only when one party's failure to perform a contractual obligation constitutes "a material breach of the contract" may the other party be discharged from its duty to perform under the contract. (*Brown v. Grimes* (2011) 192 Cal.App.4th 265, 277; accord, *De Burgh v. De Burgh* (1952) 39 Cal.2d 858, 863 ["in contract law a material breach excuses further performance by the innocent party"]; *Plotnik v. Meihaus* (2012) 208 Cal.App.4th 1590, 1602 [same].) "Normally the question of whether a breach of an obligation is a material breach, so as to excuse performance by the other party, is a question of fact." (*Brown*, at p. 277; see *Plotnik*, at pp. 1602-1603; see also *Insurance Underwriters Clearing House, Inc. v. Natomas Co.* (1986) 184 Cal.App.3d 1520, 1526-1527 ["Ordinarily the issue of materiality is a mixed question of law and fact, involving the application of a legal standard to a particular set of facts. However, if reasonable minds cannot differ on the issue of materiality, the issue may be resolved as a matter of law"]; *Whitney Inv. Co. v. Westview Dev. Co.* (1969) 273 Cal.App.2d 594, 601 ["[w]hether a breach is so material as to constitute cause for the injured party to terminate a contract is ordinarily a question for the trier of fact"].)

Here, Santa Fe introduced no evidence to demonstrate East LA Health's failure to make timely installment payments on the purchase money note as purportedly required by paragraph 7.1 of the purchase agreement, if a breach at all, was material. Accordingly, summary adjudication should not have been granted.

At the threshold we disagree with Santa Fe's contention, adopted by the trial court, that the 1991 purchase agreement itself obligated East LA Health to make timely monthly payments as part of its acquisition of the clinic property—an interpretation based solely on the language of the agreement and, therefore, one that we review de novo. (See *City*

22

*of Hope National Medical Center v. Genentech, Inc.* (2008) 43 Cal.4th 375, 395 [interpretation of a written contract is a question of law for the court unless the interpretation depends upon resolving a conflict in property admitted extrinsic evidence]; *U.S. Bank National Assn. v. Yashouafar* (2014) 232 Cal.App.4th 639, 645-646 ["'[o]n appeal from a summary judgment, the reviewing court is not bound by the trial court's construction of a contract where that construction was not based on the credibility of conflicting extrinsic evidence as to which the trial court was in a better position to form a judgment"].) As discussed, the purchase price for the clinic property was $450,000; and the purchase agreement required Santa Fe as the buyer to deliver $90,000 in cash and a promissory note, secured by a deed of trust, for the balance. East LA Health fully performed those obligations, which were completed with the closing of the transaction in December 1991, making the cash payment and delivering a promissory note with the enumerated terms and conditions. Any subsequent failure by East LA Health to make timely payments under the separate promissory note, whatever its consequences, did not constitute a breach of the purchase agreement and does not preclude a claim against Santa Fe for its breach of the representations and warranties regarding the condition of the clinic property.

However, even if we were to assume, as the trial court did, that the terms of the promissory note were somehow incorporated into the purchase agreement itself, summary adjudication on the contract claim would be improper on the ground of nonperformance. The evidence submitted by Santa Fe in support of its assertion that East LA Health failed to perform its obligations under the purchase agreement established only that East LA Health at some point stopped making timely payments on the note, not that it did not make the required payments at all. To the contrary, the deposition testimony cited by Santa Fe indicates that late payments were, in fact, made by East LA Health and accepted by Santa Fe. Indeed, as discussed, as required by paragraph 7.2 of the purchase agreement, the note specifically contemplated late payments might be made and provided for a "late charge" of 6 percent "with respect to any payment of principal,

23

interest, or other charges, not made within ten (10) days after it is due." Thus, even if arguably a breach of East LA Health's obligations to Santa Fe under the purchase agreement, whether late payments, accepted by Santa Fe, constituted a material breach of that agreement has not been established. If an issue at all, given our interpretation of the parties' agreement, the significance of East LA Health's payment history (that is, whether any breach was material) remains an issue of fact to be resolved at trial.

## DISPOSITION

The judgment is reversed. The case is remanded for further proceedings not inconsistent with this opinion. East Los Angeles Health Task Force, Inc. is to recover its costs on appeal.

PERLUSS, P. J.

We concur:

ZELON, J.

IWASAKI, J.*

---

* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.